UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| U.S. SEWER & DRAIN, INC., | Civil Action No. 15-1461 (AET) |
| Plaintiff, | |
| v. | MEMORANDUM OPINION AND ORDER |
| EARLE ASPHALT CO., et al. | |
| Defendants. | |

**BONGIOVANNI, Magistrate Judge**

## 1. INTRODUCTION

Before the Court is Defendant Earle Asphalt Company's ("Earle") Motion to Enforce Settlement Agreement ("Motion").   [Docket Entry No. 33].   Earle asks the Court to enforce the terms of a settlement allegedly reached on August 26, 2015, between Earle, Earle's bonding company and co-defendant, Federal Insurance Company ("Federal"), and the Plaintiff, U.S. Sewer & Drain, Inc. ("US Sewer" or "Plaintiff"). US Sewer has filed a response to Earle's motion [Docket Entry No. 34] to which Earle has replied [Docket Entry No. 35].   The Court has considered Earle's Motion without oral argument pursuant to L.Civ.R. 78.1(b). After fully considering all papers submitted in support of, and in opposition to the Motion, and for the reasons stated more fully below, Earle's Motion is GRANTED IN PART.

## 2. FACTUAL AND PROCEDURAL BACKGROUND

Earle's Motion arises from a breach of contract lawsuit related to the parties' participation in the New Jersey Transit Authority's ("NJTA") Interchange 48 to 63 Widening Project; Milepost 57.8 to Milepost 64.9 ("the Project").   [Docket Entry No. 34, at 1].   In August of 2011, the NJTA

1

awarded Earle with Contract No. P200.136, allowing Earle to begin performing work pursuant to the Project.   [*Id*.].   In September of 2011, Earle began subcontracting with US Sewer.   [*Id*.]. On October 28, 2011, Earle and US Sewer signed a $245,100.00 subcontractor's agreement (the "Subcontract") specifying US Sewer would clean and videotape existing drainage piping so the NJTA could determine what existing drainage piping needed repairs.   [Docket Entry No. 33-1, *Certification of James M. McMahon*, at 2; see also, Docket Entry No. 34, at 2].   For piping that required repairs, US Sewer would install a pipe liner to bring them into better working condition. [Docket Entry No. 34, at 2].   US Sewer began performing under the Subcontract in October of 2013 and Earle allegedly approved all labor, services, and material from US Sewer.   [*Id*.].   US Sewer also allegedly completed its performance of the Subcontract.   [*Id*.].

However, US Sewer alleges Earle ceased making Subcontract payments to US Sewer. [*Id*.].   To date, Earle allegedly owes US Sewer a balance of $587,170.58 under the subcontract. [*Id*., at 3].   US Sewer also alleges Earle tendered payments directly to one of US Sewer's own subcontractors, Ferratex, Inc. ("Ferratex").   [*Id*.].   The payments were for materials provided and work performed by Ferratex at US Sewer's request under the Subcontract.   [*Id*.].   In addition to being a subcontractor for US Sewer, Ferratex is allegedly a subcontractor of Earle.   [*Id*.]. Likewise, Ferratex has filed suit against US Sewer in a related litigation in the District of New Jersey styled *Ferratex Inc. v. U.S. Sewer and Drain, Inc. et al*, 3:14-cv-07527-FLW-LHG.   [*Id*.]. US Sewer has brought counterclaims against Ferratex for amounts exceeding $500,000.00.   [*Id*.].

These disputes caused the instant lawsuit, with US Sewer filing its Complaint against Earle and Federal on February 26, 2015.   [See, Docket Entry No. 1].   Following dispositive motions, the Defendants filed their respective Answers on June 15, 2015.   [Docket Entry No. 34, at 3]. On August 5, 2015 this Court conducted an Initial Conference.   [Docket Entry No. 33-1, at 2].

2

During the conference, the parties indicated a desire to try to settle the case.   [*Id*.].   Consequently, by way of an August 6, 2015 Letter Order, this Court stayed discovery so the parties could participate in an August 26, 2015 settlement conference.   [Docket Entry No. 25].   The Letter Order specified that clients with full settlement authority must be present during the settlement conference.   [*Id*.].

On August 26, 2015, Earle, Federal, and US Sewer attended a two-hour in person settlement conference with the Court.   [Docket Entry No. 34, at 3].   At the conference, counsel for all parties were present as were clients with settlement authority.   Specifically, for US Sewer, its principals Jeremy and Lisa Bowman (the "Bowmans") were physically present at the settlement conference.   [*Id*.]   During the settlement conference, Earle presented a PowerPoint presentation breaking down the work US Sewer performed on the Project.   [*Id*.].   The PowerPoint also detailed what money was paid to US Sewer, and another pipe lining contractor hired by Earle to supplement US Sewer's allegedly insufficient work.   [Docket Entry No. 33-1, at 2].   The PowerPoint also included Earle's back charges, caused by US Sewer's alleged failings on the Project.   [*Id*.].   US Sewer in turn represented the balance of the Subcontract, and the amount Earle consequently owed, was $459,976.63.   [*Id*.].   Earle disputed this amount and requested US Sewer show how it computed same.   [*Id*.].   US Sewer's representatives stated they did not have the paperwork to corroborate the number, however they could readily supply it.   [*Id*., at 3].

After a morning of negotiations conducted with the assistance of this Court, the parties agreed on a settlement.   [*Id*.].   The terms of the settlement were as follows: US Sewer would receive a lump sum payment of $234,736.46 within seven days of the execution of a settlement agreement.   [*Id*.].   In return US Sewer would provide Earle with paperwork corroborating US Sewer's computation of the remaining Subcontract balance.   [*Id*.].   Further, US Sewer would

3

release all claims of liability or interest against Earle, Federal, and related entities, but for a single breach of contract claim for the remaining Subcontract balance: $225,240.17.   [*Id*.].   This claim would be submitted to arbitration.   [*Id*.].

Counsel for Earle subsequently drafted the proposed settlement agreement and release ("Agreement") and transmitted it to Plaintiff's counsel in or around late September or early October 2015.   [Docket Entry No. 34, at 4].   Shortly thereafter, Plaintiff's counsel provided the Bowmans with a copy of the Agreement.   [*Id*.].   Upon receiving a copy of the Agreement, the Bowmans allegedly first learned that the terms included a dismissal of all claims against Defendants except for the single breach of contract claim that would be submitted to arbitration and capped at $225,240.17.   [*Id*.].   Further, the Bowmans allegedly first learned that the release within the Agreement would be binding on all subcontractors of Earle, which they fear ostensibly includes Ferratex.   [*Id*.].   After reviewing the Agreement, US Sewer retained new counsel, Mr. William Rubley, Esq. ("Rubley" or "new counsel").   [*Id*.].   His substitution was filed on the docket on November 3, 2015.   [*Id*., at 5].

While new counsel did not officially make an appearance in this matter until November 3, 2015, on October 20, 2015, Rubley informed Earle of his representation of US Sewer.   [See Docket Entry No. 34-2; *October 20, 2015 email from William Rubley*, at 5-6].   In his correspondence, Rubley also indicated that he would be providing feedback about the Agreement, along with the paperwork corroborating US Sewer's Subcontract balance amount.   [*Id*.].   Earle did not receive either, and, on November 5, 2015, Earle contacted the Court notifying it of same, and requesting a case management conference.   [*Id*.].   The Court responded on November 9, 2015 asking the parties for an update; to which US Sewer responded, though not raising any concerns about the Agreement's terms.   [*Id*.].   US Sewer responded to Earle on November 10,

4

2015, asking for a Word-version of the Agreement, and provided the breakdown of what it believed was owed to US Sewer.   [See Docket Entry No. 34-2; *November 10, 2015 email from William Rubley*, at 5].   Earle replied and provided US Sewer with a copy of the Agreement on November 17, 2016.   [Docket Entry No. 34-2; *November 17, 2015 from James McMahon*, at 7].   Three days later on November 20, 2015, US Sewer again wrote the Court regarding the parties' settlement, and the Court again directed the parties to attempt to resolve any issues regarding their settlement.   [Docket Entry No. 33-1, at 5].   Consequently, Earle immediately contacted US Sewer and US Sewer responded on the same day, stating Earle would receive the Agreement feedback by November 23, 2015.   [*Id.*].

On November 23, 2015, US Sewer provided Earle with feedback regarding the Agreement. [*Id.*; see also, Docket Entry No. 34-2, *November 23, 2015 email from William Rubely*, at 12].   In same, U.S. Sewer did not dispute Earle would pay U.S. Sewer $234,736.46 within 7 days of the Agreement being singed.   [*Id.*; see also, Docket Entry 34-1, *US Sewer Comments Regarding Agreement*, at 6].   However, US Sewer believed that the amount to be submitted to arbitration on the single remaining breach of contract claim should be $352,434.12, not the $225,240.17 discussed during the settlement conference.   [Docket Entry No. 34 at 7].   US Sewer justified the higher amount claiming that the remaining balance under the subcontract was in fact $587,170.58 not the $459,976.63 discussed during the contract.   [*Id.* at 3].   Further, US Sewer did not agree to release all of Earle's subcontractors because it believed that this release could negatively impact their counterclaims against Ferratex.   [*Id.*, at 6-7].

These changes were rejected by Earle via an email sent on the same day, in which Earle noted that US Sewer's changes were contrary to the terms agreed to during the August 26, 2015 settlement conference.   [Docket Entry No. 34-2, *November 23, 2015 email from James*

5

*McMahon*, at 12].   Earle again demanded an immediate production of US Sewer's corroborative paperwork of the original settlement amount.   [*Id.*].   US Sewer responded claiming that the Bowmans disagreed that the amount in dispute was capped at $225,240.17, arguing that the arbitrator, instead, would be determining the value of the Subcontract balance and the corresponding value of the breach of contract claim.   [*Id.*].   Two more emails were exchanged on November 23, 2015, wherein the parties were unable to reach a resolution and discussed the filing of a motion to enforce settlement.

The parties informed the Court of their inability to resolve their dispute regarding the Agreement.   As a result, the Court scheduled a telephone conference with counsel for December 18, 2015.   During that conference, the Court discussed the settlement reached on August 26, 2015.   Specifically, the Court informed counsel that a $225,240.17 cap on the arbitration award was part of the settlement agreed to by the parties on August 26, 2015.   Nevertheless, counsel for US Sewer informed the Court that it was likely its principals would dispute same.   In light of that representation, the Court directed Earle to file the instant Motion, which it did on January 29, 2016.

3.   **DISCUSSION**

    a.   **Settlement**

Earle asks the Court to enforce the entirety of the Agreement drafted by Earle following the August 26, 2015 settlement conference.   [Docket Entry No. 33-2, at 1].   Earle also asks the Court for reasonable attorneys' fees and costs associated with the negotiation and enforcement of the settlement.   [*Id.*].

Earle argues that the Agreement should be enforced because the circumstances indicate a valid and binding settlement was reached during the August 26, 2015 settlement conference.   [*Id.*, at 2].   All parties had representatives present with full binding settlement authority.   [*Id.*].

6

These representatives participated in the settlement process, which lasted more than two hours. [*Id*.].   US Sewer's representatives themselves proffered the sum of $459,976.63, representing the outstanding total balance of the Subcontract.   [*Id*.].   The representatives of US Sewer also proffered the sum of $225,240.17, representing the remaining Subcontract balance and value of the breach of contract claim to be submitted to arbitration.   [*Id*.]   Further, US Sewer's representatives agreed to provide Earle with the breakdown and supporting documentation for these amounts.   [*Id*.].   As these terms were openly discussed and agreed to during the settlement conference, Earle argues it is apparent they are binding and enforceable.   [*Id*.].   Earle also contends the settlement agreement is still enforceable even though it was not memorialized in a signed writing.   [*Id*.].

Earle's counsel drafted and submitted a copy of the Agreement to US Sewer's counsel soon after the settlement conference.   [Docket Entry No. 33-2, at 3].   The Agreement featured terms identical to those discussed during the settlement conference.   [*Id*.].   Likewise, at no point until three months after the settlement conference, November 23, 2015, did US Sewer express any dissatisfaction with the terms of the Agreement.   [*Id*.].   When US Sewer did provide feedback about the Agreement, it attempted to make the changes discussed above, in contravention of the terms clearly discussed and agreed to during the settlement conference.   [*Id*.].   When taken in conjunction, Earle argues these facts indicate US Sewer is simply unhappy with the deal it struck during the settlement conference, and is now attempting to rescind it.

US Sewer responds arguing the Court should deny Earle's Motion, and deny Earle's petition for attorney's fees.   [Docket Entry No. 34, at 5].   US Sewer argues the Motion should be denied because there is no settlement to enforce.   [*Id*.].   No settlement was reached because there was never a meeting of the minds, as the parties cannot agree on the essential terms of the

Agreement.   [*Id*., at 6].   Namely, the parties cannot agree on what amount is to be submitted to arbitration, and the difference between the parties' respective amounts is substantial.   [*Id*.].  Moreover, US Sewer argues Earle's valuation of the remaining Subcontract balance is incorrect and nonsensical as capping the balance at $459,976.63 would in essence be waiving $127,193.95 in monies rightfully owed to US Sewer.   [*Id*.].

US Sewer alternatively argues that even if there was a meeting of the minds between the parties during the settlement conference, US Sewer's then counsel did not have the express authority to settle the case pursuant to the terms in the Agreement.   [*Id*., at 7].   US Sewer argues that New Jersey state law demonstrates that the negotiations of an attorney are not binding on the client, unless the client has expressly authorized the settlement, or the client's voluntary act has placed the attorney in a situation wherein a person of ordinary prudence would be justified in presuming the attorney had authority to enter into a settlement, and not just negotiations.   See, *Amatuzzo v. Kozmiuk*, 305 N.J.Super. 469, 475-76 (App. Div. 1997); citing, *City of Jersey City v. Roosevelt Stadium Marina, Inc.*, 210 N.J.Super. 315, 327 (App. Div. 1977); see also, *Stout v. Stout*, 155 N.J.Super. 196, 203-04 (App. Div. 1977).   [*Id*.].   Because, the representatives for US Sewer only gave their former counsel limited authority to negotiate at the settlement conference, and not to ultimately settle the case, there can be no settlement.   [*Id*.].

US Sewer further contends that even if the Agreement is to be enforced, any reference to subcontractors contained in the Agreement's release should be stricken.   [*Id*., at 8].   This is because if US Sewer releases any claims it has against Earle's subcontractors, the waiver would necessarily include the $500,000 counterclaim against Ferratex.   [*Id*.].   Furthermore, US Sewer claims the release of all subcontractors was never discussed nor agreed to in the settlement conference, therefore US Sewer cannot be bound by this provision.   [*Id*.].

8

In its reply, Earle argues there was a settlement reached because the parties had a meeting of the minds about limiting the amount of the arbitration claim. [Docket Entry No. 35, at 1]. This is because the terms contained in the Agreement were those specifically discussed and agreed to in the settlement conference. [*Id*., at 2]. Indeed, Earle argues that the amount representing the capped value of the claim to be submitted to arbitration was submitted by US Sewer itself. [*Id*.]. Additionally, Earle contends that US Sewer's argument about the nonsensicalness of the remaining Subcontract balance amount is of no moment, as the only relevant inquiry is whether an agreement was reached. [*Id*.].

Earle also argues that counsel for US Sewer had the apparent authority to bind US Sewer because counsel's conduct reasonably led Earle to believe that US Sewer had given him authority to settle the case. [Docket Entry No. 35, at 2]. Earle notes that each party's representative attended the settlement conference with both the authority and intent to settle the case. [*Id*.]. Further, Earle points out that US Sewer's representatives themselves proposed specific and definite numbers allegedly representing the remaining Subcontract balance. [*Id*.]. These numbers were the numbers discussed and negotiated by their counsel. [*Id*.]. Likewise, Earle argues that throughout the day, US Sewer's counsel spoke with the Bowmans who were seated in the Courtroom, and the Bowmans had no objection to counsel continuing to negotiate and reach specific settlement terms. [*Id*.] Indeed, Earle notes that neither the Bowmans nor their attorney indicated that counsel had only limited authority to negotiate but not to enter into a settlement agreement. [*Id*.] Lastly, Earle points out that after the settlement was reached the August 26, 2015 conference, US Sewer did not object to the terms of the Agreement for almost three months. [*Id*., at 4]. Earle contends that the totality of these circumstances demonstrate the reasonableness of its belief that counsel for US Sewer had the authority to settle the case. [*Id*.]. Earle separately

9

argues that Ferratex is not a subcontractor or sub-consultant of Earle.   [*Id*.].   Earle claims that the entirety of Ferratex's work performed on the Project was done with no contractual or legal relationship to Earle whatsoever.   [*Id*.]   Consequently, Earle contends there is no issue with the provision releasing US Sewer's claims against US Sewer's subcontractors.

b.   **Fees**

Earle also argues it is entitled to reasonable attorney's fees because US Sewer's failure to abide by, and attempt to change, the terms of a clear settlement are in bad faith.   [Docket Entry No. 35, at 4].   Earle relies upon two cases to support its contention that a failure to abide by the terms of a settlement agreement can warrant the imposition of fees and costs.   See, *V. Patel & Sons, Inc. v. Shree Shiv Shakti Food, Inc.*, No CIV 06-1978 SRC, 2007 WL 913880, at *2 (D.N.J. Mar. 22, 2007); see also, *In re: Elonex Phase II Power Management Litigation*, No. 01-082, 2003 U.S. Dist. LEXIS 10717, at *11-12 (D.N.J. June 13, 2003).

In support of its petition for fees, Earle submitted billing records outlining the services counsel provided in enforcing the Agreement.   While the initial billing records provided erroneously contained certain duplicate time entries and certain time entries for services provided unrelated to this matter, Earle revised its billing records to account for these mistakes, to remove certain entries that were not actually charged to the client and to add two entries inadvertently left off of the original billing records.   [*See*, Docket Entry No. 35-1, at 10].   The total fees and costs sought by Earle in its revised request amount to $10,088.46 for work performed and expenses incurred by Earle's counsel:   Michael F. McKenna, Esq. (MFM), James McMahon, Esq. (JMM), and Mark A. Snyder, Esq (MAS), as well as by its secretarial or paralegal staff, Kara Emmons (KE) from August 28, 2015 – January 6, 2016.   [*Id*.].

US Sewer responds that Earle is not entitled to any attorney's fees or costs associated with

the enforcement of the settlement.   [Docket Entry No. 34, at 9].   US Sewer contends that as a matter of policy, attorney's fees are only awarded in exceptional circumstances if the party petitioning for the fees can show bad faith.   [*Id.*].   Earle has not demonstrated bad faith because unlike the respondents in Earle's two cited cases, US Sewer did not unilaterally ignore the terms of the Agreement.   [*Id.*, at 10].   Instead, US Sewer reasonably disagreed about the terms of the Agreement.   [*Id.*].   Therefore, US Sewer argues that these facts do not rise to the level of bad faith.   [*Id.*].

Secondly, US Sewer claims that the amount of Earle's requested attorney's fees are unreasonable.   [*Id.*, at 11].   In this regard, US Sewer takes issue with Earle's original request for fees, which included duplicate and unrelated time entries.   In this regard, US Sewer specifically objects to four time entries, two from January 5, 2016 and two from January 6, 2016, that reference duplicate work:   under the January 5, 2016 column, Mr. Snyder has two entries, "Research re: attorney's fees," and "Research awarding of attorneys' fees," each for 1.20 hours.   Similarly, under the January 6, 2016 column, Mr. Snyder has two entries, "Research re: motion to enforce settlement agreement; edit brief; edit JMM certification," and "Research motions to enforce settlement agreement; edit brief; edit JMM certification," each for 2.30 hours.   [*Id.*].   US Sewer also explicitly objects to Earle's inclusion of an unrelated time entry from December 22, 2015. [*Id.*]   Said entry states Mr. McMahon spent 1.25 hours "review[ing] rules of court on pre-trial memo as per Judge Perri order; telephone conversation with Chris Edwards re: remaining depositions and discovery."   [*Id.*].   As noted above, however, Earle recognized the erroneous nature of some of the entries included in its original petition and consequently revised same. Indeed, Earle explicitly removed the two duplicate entries (one from January 5, 2016, the other from January 6, 2016) from its revised petition as well as the unrelated time entry from December

22, 2015.   It therefore addressed these specific objections raised by US Sewer.

In addition to the aforementioned objections, however, US Sewer also argues that the individual time entries themselves, even where related to this matter and not duplicates, are grossly exaggerated.   [Docket Entry No. 34, at 11].   In this regard, US Sewer directs the Court's attention to two time entries from November 23, 2015 which state[1]:

> MFM   Review JMM e-mail with new backup documentation; discussion with JMM re: same; review draft e-mail to counsel for US Sewer; review response by US Sewer's counsel and respond to same; conference with JMM re: strategy for further handling; review e-mails from D. Driefuss re: Federal's role and respond to same; review several e-mails from new counsel for US Sewer and respond to same; discussions with JMM for strategy for further handling; review letter prepared by JMM to send to Judge Bongiovanni and revise same; send to JMM for final review prior to sending to Court.
> 2.50

> JMM   Review revisions to settlement agreement by US Sewer new counsel; review itemization of contract balance from same; discussion with MFM re: same; e-mail to Brian Cooper re: same; e-mail response to US Sewer counsel re: same; begin drafting letter to judge re: US Sewer failure to comply with settlement terms.
> 4.50

[*Id*.].   US Sewer claims this seven hours of time expended between two attorneys is entirely too long to review US Sewer's Agreement feedback, as the only revisions made were removing the cap of the amount to be submitted to arbitration; and removing any references to sub-contractors in the release.   [*Id*.].

In sum, US Sewer argues that Earle is essentially seeking attorneys' fees for the entirety of the time it spent on the case following the initial conference.   [*Id*.].   US Sewer argues that these fees would have been incurred regardless of whether US Sewer had accepted the Agreement. Therefore, US Sewer claims they are not reasonable and should be denied.   [*Id*.].

Earle counters that its revised petition reasonably seeks the fees it unreasonably incurred

---

[1]  No other specific time entries have been objected to by US Sewer.

as a result of US Sewer's intentional disruption of the settlement of this litigation through its refusal to comply with the terms of the Agreement.   [Docket Entry No. 35, at 4-5].   Earle redoubles its earlier arguments, relying on the two cases it originally cited to establish US Sewer's bad faith. [*Id*., at 5].   Earle argues that bad faith exists here because despite the clear terms of the settlement agreement, US Sewer is now refusing to follow through on same.   As such, Earle claims there is no reasonable disagreement about the terms of the parties' settlement.   [*Id*.]   Consequently, Earle claims that its motion to enforce should be granted as should its revised petition for attorneys' fees and costs.

4. **ANALYSIS**

a. **Settlement**

Federal courts look to state contract law when determining whether an enforceable settlement agreement has been reached.   See, *Dep't of Pub. Advocate v. N.J. Bd. of Pub. Util.*, 206 N.J. Super. 523, 527-28 (App. Div. 1985); see also, *Excelsior Ins. Co. v. Pennsbury Pain Ctr.*, 975 F.Supp. 342, 348-49 (D.N.J. 1996) (holding that "state law governs the construction and enforcement of settlement agreements in federal court.").   Under New Jersey state law, "[a]n agreement to settle a lawsuit is a contract which, like all contracts, may be freely entered into[,] and which a court, absent a demonstration of 'fraud or other compelling circumstances,' should honor and enforce as it does other contracts."   *Pascarella v. Bruck*, 190 N.J. Super. 118, 124-25 (App. Div. 1983) (internal quotations omitted).

Traditional contract law rules provide that a contract arises from the manifest intentions of the parties to engage in an offer and acceptance of sufficiently definite essential terms.   *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435, 608 A.2d 280 (1992) (citations omitted); See also, *Friedman v. Tappan Development Corporation*, 22 N.J. 523, 531, 126 A.2d 646 (1956). To be

13

enforceable, a contract must also be accompanied by consideration.   *Friedman*, 22 N.J. at 533, 126 A.2d 646.   In bilateral contracts or agreements, such as the one in the case at hand, where the parties make mutual promises to do some future act, "the consideration of the promise of one party is a promise on the part of the other."   *Excelsior Ins. Co. v. Pennsbury Pain Ctr.*, 975 F. Supp. 342, 349 (D.N.J. 1996).   Moreover, under New Jersey law, as long as "the parties orally agree on the essential terms," a contract is formed.   *McDonnell v. Engine Distributors*, Civil Action No. 03-1999, 2007 WL 2814628, *3 (D.N.J. Sept. 24, 2007).   "Indeed, as long as those essential terms are agreed to, 'the settlement will be enforced notwithstanding the fact that a writing does not materialize because a party later reneges.'"   *Id.*   (quoting, *Lahue v. Pio Costa*, 263 N.J. Super 575, 596 (App. Div. 1993)).   This is true "'even though [the parties] contemplate the later execution of a formal document to memorialize their undertaking.'" *Id.*   (quoting, *United States v. Lightman*, 988 F.Supp. 448, 459 (D.N.J. 1997)).   The settlement of litigation ranks high in the public policy of New Jersey.   See, *Lahue*, 263 N.J.Super. at 581.   Therefore "Courts will strain to give effect to the terms of a settlement whenever possible."   *Dept. of Public Advocate v. N.J. Bd. Of Public Utility*, 206 N.J.Super. 523, 528 (App. Div. 1985).

In the instant case, the conduct of the parties demonstrates that Earle, Federal and US Sewer reached a binding settlement during the August 26, 2015 settlement conference. This Court's August 6, 2016 Letter Order [Docket Entry No. 25] directed both parties to exchange whatever documents were necessary for settlement, and notified the parties that clients *with full settlement authority* were required to attend the settlement conference in person.   [*Id.*].   Therefore, it was clear that the purpose of the settlement conference was to fully and finally settle the litigation. Both parties attended the settlement conference with representatives having authority to fully and finally settle the lawsuit. Both counsel and the representatives actively participated in the

14

negotiations that took place on August 26, 2015, and each party also came prepared with a set of terms.

Specifically, Earle attended with a PowerPoint presentation explaining what monies it had already paid to US Sewer and in turn, US Sewer claimed the total Subcontract balance was $459,976.63.   After a morning of negotiations the parties reached an agreement with sufficiently clear terms: Earle agreed to pay US Sewer a lump sum payment of $234,736.46 within seven days of the execution of the settlement agreement; in return, US Sewer would release all claims of liability or interest, against Earle, Federal and their related entities, but for submitting to arbitration a single breach of contract claim for the remaining Subcontract balance, which would be capped at $225,240.17.   Critically, in US Sewer's moving papers, outside of arguing that its former counsel lacked the authority to settle this matter, US Sewer has not disputed that these were, in fact, the terms that were negotiated and agreed to during the settlement conference. Therefore, from the present record, it appears there was no absence of mutuality of accord between the parties or their attorneys during the settlement conference regarding any of the material and essential terms of the Agreement.

Further, the Agreement that was drafted by Earle and sent to US Sewer soon after the conference corroborates these exact essential terms. Moreover, upon receiving a copy of the Agreement, US Sewer did not raise any objection to the Court, nor Earle, about same until almost three months after the settlement conference. In sum, the Court finds that a valid and binding settlement was reached. While US Sewer represented in their response papers that counsel did not have the authority to finally settle the case, the evidence presented undermines that contention. Indeed, a person of ordinary prudence would be justified in believing that counsel had authority to enter into an actual settlement, not just negotiations.   See *Amatuzzo*, 305 N.J.Super. at 475-76.

15

This is particularly true in light of US Sewer's failure to indicate *in any way whatsoever* that counsel did not have authority to fully settle the case during the settlement conference.   The Bowmans were physically present at the settlement conference.   Counsel spoke with them frequently in the courtroom regarding the settlement negotiations and relayed their position with respect to the appropriate settlement terms.   Based on their discussions with counsel, US Sewer entered into an agreement to settle this case with specific and reasonable terms that it largely proffered.   Under these circumstances, it was reasonable for Earle to believe that US Sewer's counsel had authority to enter into the settlement agreed to by the parties in this case.

While a client's indication that he did not authorize a settlement, where substantiated by plausibly competent evidence, may raise a material and substantial issue as to whether he granted his attorney actual authority to settle, based on the foregoing circumstances, that is not the case here.   See *Amatuzzo v. Kozmiuk*, 305 N.J. Super. 469, 476 (App. Div. 1997) (finding defendant's certification stating he did not enter into a settlement with plaintiff filed in opposition to plaintiff's request to enforce settlement was sufficient under circumstances of case to raise material and substantial issue as to whether he granted his attorney actual authority to settle, necessitating hearing to determine whether authority to settle was granted.)   Rather, it appears that US Sewer believes it can get more out of the settlement and, as such, now seeks to renege.   A parties' after the fact change of heart does not invalidate a settlement.

The Court finds that the settlement as formalized in the Agreement drafted by Earle is enforceable.   With respect to US Sewer's concerns regarding Ferratex, the Agreement should specify that Ferratex was not a subcontractor of Earle regarding the work performed in connection with NJTA's Interchange 48 to 63 Widening Project.

b. **Fees**

16

Traditionally the "American Rule" prohibits fee shifting in most cases. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991) (citing, *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 259 (1975)). However, "a court may assess attorney's fees when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Alyeska*, supra, 421 U.S., at 258–259 (quoting *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.*, 417 U.S. 116, 129 (1974)). Bad faith as well as vexatious, wanton or oppressive behavior can be established "by delaying or disrupting the litigation or by hampering enforcement of a court order." *Chambers,* 501 U.S. at 45-46. A "[r]efusal to abide by the terms of a settlement agreement can constitute bad faith, entitling the wronged party to attorneys' fees." *In re: Elonex,* 2003 U.S. Dist. LEXIS 10717, at *11-12 (internal quotation marks and citation omitted). "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers,* 501 U.S. at 44.

Here the Court finds that the imposition of attorneys' fees and costs related to the instant motion to enforce the August 26, 2015 settlement is warranted. The case *In re: Elonex*, 2003 U.S. Dist. LEXIS 10717, at *1, cited by Earle is instructive. The plaintiff, Elonex, and the defendant, Compal, entered into a settlement agreement and release on June 6, 2002 whereby Compal was required to make a payment to Elonex by January 7, 2003. Compal could reduce the amount of its January 7, 2003 payment by obtaining specifically defined "Release Credits" if certain other Taiwanese defendant groups "enter[ed] into a written settlement agreement, making provision for a Stipulation of Dismissal in respect of the actions noted therein, *on or before December 31, 2002.*" *Id.* (emphasis added). Because no final settlement had been reached on or before December 31, 2002, Compal was not entitled to a release credit and consequently needed to pay Elonex $250,000 on January 7, 2003. *Id.* Compal failed to make this payment. *Id.*

17

Elonex brought suit to enforce the settlement claiming the terms of the settlement were clear and Compal had simply failed to abide by them.   *Id*. at 3.   The Court found that Compal's refusal to pay Elonex $250,000 on January 7, 2003 was a material breach of the settlement agreement.   *Id*.   The Court also awarded Elonex fees finding that Compal's repeated attempts "at avoidance of [its] obligations under the settlement agreement [are] both in bad faith and vexatious."   *Id*. at 4, citing, *Leonard v. University of Delaware*, 204 F.Supp.2d 784, 789 (D.Del.2002).   Compal's reason for refusing to abide by the terms of the settlement agreement were frivolous, and there was no justification for its repeated failure to abide by its obligations.

Much like Compal, here, US Sewer has failed to abide by the clear terms of the settlement that were reached during the August 26, 2016 settlement conference.   When a set of clear terms emerge and all parties reasonably appear to manifest their assent to same, a settlement has been reached.   An obligation is then placed upon the parties to abide by those terms.   When a party blatantly fails to do so, the imposition of attorneys' fees and costs is warranted.

Here, US Sewer failed to abide by the terms of the settlement reached on August 26, 2015 and continued this failure even after the December 18, 2015 conference during which the Court informed new counsel that, among other things, the settlement reached included a cap of $225,240.17 on the sole remaining breach of contract claim that the parties had agreed to arbitrate. The Court finds that US Sewer's continued refusal to abide by the terms of the parties' settlement warrants the imposition of the attorneys' fees and costs reasonably incurred by Earle in pursuing the instant motion to enforce.

i.   **Reasonableness of Hourly Rate**

When evaluating a fee application, federal courts must calculate the "lodestar" amount by multiplying the attorney's reasonable hourly rate by the number of hours reasonably spent.

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 426 F.3d 694, 703 (3d Cir. 2005) (citing *Hensley v. Eckerhart*, 461 U.S. 424 (1983)).   To determine a reasonable hourly rate, the Court must assess the skill and experience of the attorneys and compare their rates to the community for similar services by lawyers of reasonably comparable skill, experience and reputation.   *Blakey v. Continental Airlines*, 2 F.Supp.2d 598, 602 (D.N.J. 1998).   In the present matter, the hourly rates sought by the Plaintiffs, as attached in their billing records, are as follows:

| ATTORNEY | RATE | SUGGESTED RATE |
|---|---|---|
| Michael McKenna | $375.00 | No objection |
| James McMahon | $300.00 | No objection |
| Mark Snyder | $225.00 | No objection |
| Kara Simmons | $90.00 | No objection |

The party seeking attorney's fees has the burden of producing sufficient evidence of what constitutes a reasonable market rate for the character and complexity of the legal services rendered. *Id.* at 603.   If an objection is lodged, the party seeking to recover fees bears the burden to show that the fee request is reasonable.   *Blum v. Stenson*, 465 U.S. 886, 895-96 n.11 (1984).   The fee applicant must provide appropriate documentation of the hours spent and the market rate. *Hensley*, 461 U.S. at 433.   If the documentation is inadequate, a court may reduce the award accordingly.   *Id.*   Here Earle has provided a billing record for all services rendered relating to enforcing the settlement. The record lists the rates for each attorney and staff member. While the record does not touch on the reasonableness of their hourly rates, US Sewer has not objected to the hourly rates listed by the Earle's counsel.

Further, in examining the pertinent case law, it appears that the rates listed by Earle are reasonable.   See e.g.*, Jama v. Esmor Correctional Servs., Inc.*, 577 F.3d 169, 181 (3d Cir. 2009)

(noting that fees ranging from $600 for a partner to $205 for a first-year associate were reasonable); *In re Mercedes-Benz Tele Aid Contract Litig.*, Civ. No. 07-2720 (DRD), 2011 WL 4020862, at *7 (D.N.J. Sept. 9, 2011) (holding that hourly rates up to $750 for partners and $560 for associates were reasonable); *Illinois Nat'l Ins. Co. v. Wyndham Worldwide Operations*, Civil Action No. 09-1724, 2011 WL 2293334, at *2 (D.N.J. Jun. 7, 2011) (noting that hourly rates up to $540 for partners, $360 for associates, and $162 for paralegals were reasonable); *Aerogroup Internat'l, Inc. v. Ozburn-Hessey Logistics, LLC*, 2011 WL 1599618, at *2-3 (D.N.J. Apr. 27, 2011) (affirming the undersigned's determination that hourly rates of up to $625 for partners, $340 for associates, and $160 for para-professionals are within the arena of reasonable rates).   More importantly, US Sewer has submitted no evidence to contest Earle's hourly rates.   As such, the Court is satisfied that Earle has carried its burden of showing that the hourly rates charged are reasonable based on the prevailing market rate.

ii.   <b>Reasonableness of Hours Billed</b>

The party seeking fees has the burden to come forward with evidence establishing the number of hours worked.   *Smith v. Phila. Hous. Auth.*, 107 F.3d 223, 225 (3d Cir. 1997).   If there is a dispute with respect to a fee application, the opposing party must make specific objections.   *Rode v. Dellarciprete,* 892 F.2d 1177, 1183 (3d Cir. 1990).   Once an adverse party raises specific objections to the fee request, the District Court has a great deal of discretion to adjust the fee award in light of those objections.   *Id.*   However, the District Court cannot decrease a fee award based on factors not raised at all by the opposing party.   *Id.*

While the lodestar is presumed to yield a reasonable fee, *Washington v. Pa. County Court of Common Pleas*, 89 F.3d 1031, 1035 (3d Cir. 1996), either party may seek an adjustment of the lodestar amount by showing an adjustment is necessary.   *Mosaid Techs., Inc. v. Samsung Elecs.*

20

*Corp.*, 224 F.R.D. 595, 597 (D.N.J. 2004).   In deviating from the lodestar, courts may consider numerous factors, including, for example, the time spent and labor required; the novelty and difficulty of the legal issues; the customary fee in the community; whether the fee is fixed or contingent; the nature and length of the professional relationship with the client; and awards in similar cases.   See *Public Interest Research Group v. Windall*, 51 F.3d 1179, 1185 n.8 (citing *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)).   Indeed, the District Court ultimately "retains a great deal of discretion in deciding what a reasonable fee award is" (*Bell v. United Princeton Properties*, 884 F.2d 713, 721 (3d Cir. 1989)), and "in determining whether the fee request is excessive . . . the court will inevitably engage in a fair amount of 'judgment calling' based upon its experience with the case and the general experience as to how much a case requires." *Evans v. Port Auth. of NY & NJ*, 273 F.3d 346, 362 (3d Cir. 2001).

Earle's billing record is broken down by category of work as well as a printout from its time recording system showing each time entry for which it seeks compensation.   [*See* Docket Entry No. 33-1 *Lewis & McKenna Billing Record*, at 16-26; see also, Docket Entry No. 35-1, *Revised Lewis & McKenna Billing Record*, at 10].   Earle seeks to impose fees and costs dating back to August 28, 2015 and continuing through January 6, 2016, the Court finds that to be an inappropriate time frame.   While the settlement was reached on August 26, 2015, the parties anticipated formally memorializing said agreement.   As a result the parties expected certain additional work to be necessary at that time.   The fact that the parties did not initially see eye to eye on the Agreement drafted by Earle is not in and of itself particularly troubling.   Such disputes are not uncommon and the parties to same are often able to resolve their issues on their own with little, or even sometimes no, nudging by the Court.

What is troubling, however, is US Sewer's decision to continue to ignore the settlement

reached on August 26, 2015 even after the Court conducted the December 18, 2015 conference during which it informed new counsel that the settlement included, among other things, a cap of $225,240.17 on the breach of contract claim to be arbitrated.   The Court finds that US Sewer's failure to abide by the terms of the parties' settlement from that point forward warrants the imposition of attorneys' fees and costs.

According to the billing records provided by Earle, since December 18, 2015, Earle's attorneys' fees and costs are as follows:   Mark Snyder billed 10.3 hours of charged work at $225/hour amounting to $2317.5 in fees; (2) James McMahon billed 4.95 hours of charged work at $300/hour amounting to $1485 in fees; (3) Kara Simmons billed .25 hours of charged work at $90/hour amounting to $22.50 in fees; and (4) Earle incurred $230.81 in expenses.   In total this aggregates to an award of $4055.81.   The Court is aware that this figure does not include resources spent by Earle reviewing US Sewer's opposition brief to the instant motion or filing its reply.   Earle has seven days from the date of the Entry of this Memorandum Opinion and Order to supplement its request for fees and costs with same.   All time entries associated with revising its initial fee petition must be excluded.   US Sewer has seven days from the date Earle submits its supplementation to file its objections, if any, to same.

## IV.    CONCLUSION

For the reasons stated above, IT IS SO ORDERED:

1. Earle's Motion to Enforce the Settlement is GRANTED IN PART. US Sewer is to execute a copy of the Agreement consistent with this Memorandum Opinion and Order within seven days of the date of the entry of same.

2. Earle is direct to supplement its fee petition and US Sewer to respond to same in accordance with the terms of this Memorandum Opinion and Order.

3.   Docket Entry No. 33 is terminated

Dated: June 22, 2016

                                          s/Tonianne J. Bongiovanni

                                          **HONORABLE TONIANNE J. BONGIOVANNI**
                                          **UNITED STATES MAGISTRATE JUDGE**

23